# Supreme Court of Florida

_____

No. SC14-971
_____

**THOMAS RIGTERINK,**
Appellant,

vs.

**STATE OF FLORIDA,**
Appellee.

[April 21, 2016]

PER CURIAM.

This case is before the Court on appeal from an order denying a motion to vacate convictions for first-degree murder and sentences of death under Florida Rule of Criminal Procedure 3.851. We have jurisdiction. See art. V, § 3(b)(1), Fla. Const. For the reasons expressed below, we affirm the circuit court's denial of relief on all claims.

## FACTS

Thomas Rigterink was convicted for the 2003 murders of Jeremy Jarvis and Allison Sousa and sentenced to death for both murders. Rigterink v. State (Rigterink I), 2 So. 3d 221, 227 (Fla. 2009), vacated by Florida v. Rigterink

(Rigterink II), 559 U.S. 965 (2010).  The facts were detailed by this Court in

Rigterink I:

> Shortly after 3:00 p.m. on September 24, 2003, a male in his late twenties to early thirties, who fit the general description of Rigterink, attacked victim Jeremy Jarvis with a ten-to-eleven-inch knife.  The attack began inside the warehouse residence of Jarvis, which was located in the fifth unit of the complex, and eventually moved outside.  A male eyewitness testified that as he drove past this location, he slowed his vehicle and viewed two men—one, an apparent attacker, standing above another, an apparent victim.  The victim was lying on the sidewalk immediately in front of one of the building units. . . .  It appeared that the attacker was attempting to drag the victim into the last unit of the building. . . .  When the victim fled toward the first unit of the complex, the witness observed a significant amount of blood flowing from wounds on his chest.  The witness observed the victim approach and open the door of the first unit, while the attacker—who was "about halfway down" the sidewalk at this point—remained in pursuit. . . .
>
> At the time, units 1 and 2 of this dual-use warehouse complex served as the office of a construction business.  A second victim, Allison Sousa, and a female eyewitness were both secretaries at this establishment . . . .  That afternoon, Sousa and the female witness heard screaming outside of the construction office.  They approached and opened the door of unit 1, and [Jarvis] entered the office and sat down in a chair near the door.  The female eyewitness testified that Jarvis appeared to be experiencing serious blood loss from a wound on the right side of his chest. . . .  Sousa began to care for the man and to call 911.  She instructed the female witness to go to the office kitchen in the back to obtain some towels to address the obvious injuries . . . .  The witness obeyed, and as she began to return to the front of unit 1, the witness heard the door slam.  She continued forward toward a pass-through window located between the main-office and lobby areas.  Through this window, the witness observed a second male aggressively approaching Sousa. . . .  The witness saw that Sousa was still attempting to call 911, and she also caught a glimpse of the second man's profile and a side view of his body.  At trial, she described him . . . [and] th[e] description is consistent with Rigterink's appearance on September 24, 2003.  The witness . . . felt

that he was "going after" Sousa and that he had seen her (the witness) approach the window. For that reason, the witness fled to an office located further toward the rear of unit 1. As the witness ran, she heard Sousa scream, "Don't hurt me. Don't hurt me." When the witness reached the rear office, she closed the door, locked the deadbolt, and dialed 911.

The PCSO [(Polk County Sheriff's Office)] received two 911 calls from this location on September 24, 2003. The dispatcher received Sousa's call at 3:07:37 p.m. and received the female eyewitness's call at 3:07:46 p.m. The recording of the first call reveals:

> 911 Operator: "911. What's your emergency? Hello?"
> 911 Caller: "Oh, my God. Don't—don't hurt me. No. . . ."

The dispatcher then heard "people . . . throwing something around" and afterward total silence. The line remained open for four minutes. . . . At trial, the female eyewitness testified that . . . she heard scuffling, banging, and impacts against the walls . . . . She later heard someone rub against the walls and attempt to gain access to the rear office in which she was hiding. She only opened the door and emerged from the office once PCSO deputies had arrived and secured the crime scene. . . .

When PCSO personnel arrived, they secured the entire complex and discovered the lifeless bodies of Jarvis and Sousa in the rear-warehouse area of unit 1. . . . [T]he medical examiners established that the attacker stabbed or cut Jarvis a total of twenty-two times and stabbed or cut Sousa a total of six times. Both victims had several injuries to their hands and limbs that were consistent with defensive wounds. . . .

Inside unit 1 . . . the CSTs [(Crime Scene Technicians)] encountered abundant evidence of a bloody, vicious attack. Both sides of the entry door to unit 1 were smeared with blood. There was a large pool of blood near the entrance, as if someone had been standing or sitting there while bleeding heavily . . . . The CSTs also found a blood-smeared gumball dispenser in the lobby, which was overturned, separated from its base . . . . The heavy blood stains on the walls and doors of unit 1 were consistent with someone forcefully pushing another—who was bleeding profusely—against these surfaces. . . . Further, the pass-through window and the entire hallway

leading through unit 1 were smeared with blood. In the main-office area, there was a large pool of blood under a desk as if one of the victims had sought refuge there. A phone on top of the desk was off the hook and dangling from its cord just above the floor. A veritable trail of blood continued down the hallway into the kitchen area, where large amounts of blood were smeared on a refrigerator, a trash bin, and some of the cabinets. Continuing along this trail of blood toward the rear of the unit, the door between the rear-office and warehouse areas had been damaged along with its locking mechanism and frame. This damage was consistent with someone attempting to charge or crash through the door . . . . Additionally, there were bloody, smeared palm prints on the door. The blood trail finally ended in the rear-warehouse area near the bodies of Jarvis and Sousa. . . . The victims' wounds were consistent with the attacker stabbing or cutting them with a ten- or eleven-inch blade.

Inside unit 5 (the residence of Jarvis), the CSTs discovered large blood smears on the wall adjacent to the entryway—consistent with the conclusion that a struggle occurred . . . . Blood also covered much of the flooring. Furniture, including a sofa, was overturned and in disarray. A trail of blood droplets led from unit 5 along the sidewalk to the entrance of unit 1. FDLE personnel developed two bloody latent fingerprints on the inside of the door to unit 5, which were later determined to match Rigterink's relevant print patterns. Fingerprint analyst Patricia Newton testified that the photographs of these prints . . . were consistent with the print-donor's fingers having already been covered in blood and the donor then touching the door, rather than the surface of the door having blood on it with the print-donor merely touching the freshly deposited blood. At various locations hidden inside unit 5 . . . the CSTs found three to five pounds of marijuana with a street value of several thousand dollars. . . . Jarvis's mobile phone was the final significant item of evidence that the PCSO discovered in unit 5. Detective Jerry Connolly, the lead detective on this case, and other PCSO investigators eventually used this phone, and associated phone records, to compile a list of Jarvis's known associates . . . .

. . . .

Using the call log on Jarvis's mobile phone, along with the phone records that the PCSO later obtained from [Jarvis's] service provider, Detective Connolly and his colleagues began to establish contact with Jarvis's known associates. One of the first associates that

- 4 -

they contacted was Marshall Mark Mullins. . . . Detective Connolly and a group of PCSO detectives . . . contacted Mullins at his home. The detectives . . . questioned him with regard to his whereabouts during the afternoon of September 24, 2003. Mullins provided a complete alibi. . . .

> . . . .

At approximately 11:30 a.m. on the morning of September 25, 2003 (the day following the murders), two detectives . . . went to Rigterink's condominium ("condo") . . . . They were interested in this location because of phone calls between a phone located at this address and Jarvis's mobile phone, which occurred on the day of the murders. [N]o one responded to the door. . . .

While they waited outside, the detectives contacted Rigterink's parents, who agreed to bring him to his condo for an interview. Rigterink arrived at 7:30 p.m. and invited the detectives inside. At approximately 7:45 p.m., two additional detectives . . . arrived to question Rigterink. Rigterink explained that . . . he called Jarvis to purchase some marijuana. He also stated that sometime after 2 p.m., he had another phone conversation with Jarvis concerning the same topic. . . . As part of this questioning, Rigterink volunteered the names of three additional known associates of Jarvis—including . . . Mullins—who were also allegedly involved in the drug trade. . . .

PCSO investigators next made contact with Rigterink on October 9, 2003. By this time, the PCSO—with FDLE assistance— had been able to obtain suitable photographs of the bloody latent prints recovered from the front door of unit 5, and they were in the process of obtaining "elimination prints" from all known associates of Jarvis to rule them out as suspects in the ongoing murder investigation. On October 9, Detective Connolly spoke with Rigterink in his condo. The two men discussed Rigterink's dealings with Jarvis in regard to purchasing marijuana and the timeframe during which Rigterink had placed the phone calls to Jarvis on the day of the murders. Rigterink agreed to visit the PCSO the next day, October 10, 2003, to provide "elimination prints," but never appeared for that appointment.

At 4:30 p.m. on October 10, Rigterink called Detective Connolly to explain that he would not be able to provide his fingerprints that day due to a lack of transportation. As an alternative, Rigterink offered to appear the following Monday, October 13, 2003. Rigterink also failed to appear on the 13th . . . . On October 14 and

- 5 -

15, the PCSO investigators were unable to establish contact with Rigterink . . . .  At trial, Rigterink testified that he then decided to hide on his parents' roof . . . .

. . . .

While on the roof, Rigterink saw the PCSO investigators come and go on October 15, 2003.  During this time, the PCSO . . . executed [a] consent-search form to . . . search a 1992 blue Toyota pickup that belonged to Rigterink's father. . . .  [T]he CSTs later discovered blood near the driver-side door, armrest, seatbelt and seatbelt assembly, steering wheel and column, and the passenger-side floorboard area.  At trial, Rigterink admitted that he borrowed his father's . . . pickup on Monday, September 22, 2003, and that he continued driving the truck until Wednesday, September 24, 2003.  The PCSO investigators were not aware of this information at the time, but the blood found inside the truck was genetically consistent with that of Jarvis. . . .  [Some] samples were consistent with mixtures of Rigterink's and Jarvis's blood, but excluded Sousa as a possible donor.  [N.10]

[N.10]  Additionally, the PCSO could not exclude Rigterink as the source of the foreign DNA discovered under Jarvis's fingernails.

On the morning of October 16, 2003, from his perch on the roof, Rigterink saw his mother, Nancy, who appeared to be distressed.  Rigterink descended from the roof to comfort her.  At approximately 10 a.m. on the 16th, Nancy called Detective Connolly and explained that Rigterink was ready to speak with the PCSO investigators.  When Detective Connolly and other investigators arrived, Rigterink had just finished a shower and, while he dressed, Rigterink told Detective Connolly that two men from Lake Wales who sold "ice" (i.e., methamphetamines) might have murdered Jarvis and Sousa.  After some discussion, Rigterink agreed to accompany the police to the PCSO Bureau of Criminal Investigations ("BCI") to provide "elimination prints."  Rigterink was driven by his parents to the BCI office.

After Rigterink provided "elimination prints," he was interviewed by a group of PCSO detectives.  Following several hours of questioning—which included repeated accusations of dissembling and the disclosure that Rigterink's fingerprints matched those discovered in blood at the crime scene—Rigterink eventually admitted

in a videotaped statement that (1) he traveled to the dual-use warehouse complex on September 24, 2003, to purchase marijuana from Jarvis; (2) he struggled with Jarvis while holding a large knife, but did not recall stabbing anyone; (3) he pursued Jarvis into unit 1; (4) he recalled certain aspects of these events, but his memories appeared as disjointed "Polaroid snapshots"; (5) he eventually discovered Sousa's body and "freaked out"; and (6) in the midst of "hauling ass" away from the warehouse complex, he disposed of the bloody knife and a black Jansport backpack—which contained his bloody clothing—by throwing these items off of a bridge. At the conclusion of this interrogation, PCSO personnel arrested Rigterink for the murders of Jarvis and Sousa.

. . . .

In total, the October 16 police interview or interrogation continued for over four hours as Rigterink remained in the same small room. However, the unrecorded portion of the interrogation, which was not challenged [in a motion to suppress], covered from approximately 11 a.m. until 2:24 p.m. (roughly 3.5 hours). . . .

. . . .

While the police were waiting for fingerprint analysts to compare Rigterink's fingerprints to the bloody latent prints discovered at the crime scene, Rigterink was taken to a six-by-eight, sound-insulated interrogation room, which contained three chairs and a small desk. Initially, Detectives Connolly, Rench, and Raczynski were all inside this small room with Rigterink. . . . [T]he interrogation-room door was closed but not locked. PCSO personnel instructed Rigterink's parents to remain waiting in the lobby. Rigterink was not handcuffed or restrained during the interrogation.

During the unrecorded portions of the interrogation, Rigterink provided three irreconcilable stories in response to repeated accusations from the detectives that he was lying with regard to his activities and whereabouts on the day of the murders. First, Rigterink claimed that he called Jarvis to establish a marijuana deal on September 24, 2003 (the day of the murders), but he never actually went to Jarvis's home that day. At the conclusion of his first story, the detectives accused Rigterink of lying. In response, Rigterink offered a different version of the facts: He traveled to Jarvis's home on the day of the murders, completed a purchase of marijuana, and left at a time when Jarvis was alone and unharmed. At the conclusion of

Rigterink's second story, the detectives again stated that he was lying and that he was somehow involved with these murders.

The detectives finally decided to confront Rigterink with the fact that two of his fingerprints matched the bloody latent prints recovered from the crime scene. After being confronted with the fingerprint match, Rigterink provided a still different version of the facts. In this third rendition, Rigterink stated that he arrived after the murders occurred. Specifically, he claimed that when he approached unit 5, he saw blood smeared over the entryway. Rigterink then walked inside unit 5 and "touched everything" in the process of looking for Jarvis. He was unable to find Jarvis in unit 5, so he exited. Once outside, he noticed a blood trail leading from unit 5 to unit 1, so he followed the trail until he arrived at unit 1. He entered unit 1 and observed a large amount of blood and two people lying on the floor. Rigterink then approached the bodies and checked both of their pulses. He could not find a pulse on either victim. At this point, Rigterink realized that he was covered in blood and became scared, so he fled and drove home. Rigterink could not explain why he was covered in blood. He did not call 911 because he was frightened. Rigterink estimated that he spent only five minutes at the crime scene.

At the conclusion of his third story, the detectives again accused Rigterink of lying with regard to his involvement in these murders. Rigterink then replied that he would tell the detectives "the whole truth." Detective Connolly testified that Rigterink was responsive and alert throughout this process. It was only after Rigterink had agreed to "tell the whole truth," that Detective Connolly verbally advised him of his Miranda rights and requested that he read and sign a rights-waiver form to ensure the admissibility of his confession. . . . Once Rigterink was read his Miranda rights . . . Detective Connolly turned on a hidden recording device and microphone located within the interview room.

. . . .

Rigterink . . . drove his father's blue 1992 Toyota pickup to the warehouse complex. . . .

When Rigterink traveled to Jarvis's home on the 24th, he carried a black Jansport backpack in which he placed a black hunting knife with a ten- or eleven-inch blade that began straight but curved toward its tip. . . .

Rigterink described the remaining events through a series of five "Polaroid snapshots." Once he entered unit 5, he and Jarvis

- 8 -

spoke briefly about the new batch of marijuana, and then Jarvis began to reach under his sofa to retrieve something.  This is the last thing that Rigterink remembered before being "locked up" in a struggle with Jarvis near the front door of unit 5. . . .  As part of the first "Polaroid snapshot," Rigterink stated that he saw himself "locked up" with Jarvis and perceived that he had the hunting knife in his hand and that he was covered in blood. . . .

When they moved outside, Rigterink saw himself standing, while Jarvis was kneeling, which is consistent with the testimony of the male eyewitness presented at trial. . . .  Rigterink then recalled a second "Polaroid snapshot":

> I remember being there.  I can tell you exactly the position we were in. . . .  And I remember I was holding onto him.  I don't know if I had the knife in my hand because I thought I had him with two hands, but I know I still had the knife in my hand, holding onto him.  And the next thing I remember—I don't—I don't remember at all. . . .  [A]nd in any event, the next thing I remember is running.  I think I was right behind him.

He then transitioned to a third "Polaroid snapshot," this time within unit 1:  "And the . . . next image I have is [Jarvis] swinging a bubble gum dispenser at me.". . .  Rigterink then recalled a fourth "Polaroid snapshot":  He ran down a long hallway in unit 1 and "jumped into" or "ran through" the doorway separating the rear-office area from the warehouse area. . . .

Rigterink then segued into his fifth "Polaroid snapshot":  "And the last thing I remember is looking at the girl [Allison Sousa].  I didn't even see Jeremy [Jarvis] in the back room.  And then I hauled ass.". . .

After these events, Rigterink claimed that he removed his bloody shirt and ran back into unit 1 to retrieve the backpack before leaving. . . .

Rigterink then described his drive away from the crime scene:  "I remember being at [a traffic] light and looking down and being covered in blood."  When Rigterink looked down and discovered that he was covered in blood, he thought "[w]hat the f*ck happened."  At that moment, he determined that it would be best to get rid of the knife and the backpack because they were "obviously evidence at that

- 9 -

time that something had happened." Rigterink claimed that he threw the knife and the black backpack over a bridge that he crossed on his way home (despite searching, the PCSO never recovered these evidentiary items). . . .

. . . .

Rigterink claimed that by "[t]hat Friday[, September 26, 2003,] I knew that I'd done it. . . . I don't remember the event but I knew what had happened." Rigterink stated that he did not discuss the killings with anyone or tell anyone what he had done.

. . . .

Rigterink was 32 years old when he provided his confession and, until his arrest, he was not placed in handcuffs or otherwise restrained.

. . . .

During the defense case-in-chief, Rigterink took the stand and testified . . . . Through his testimony, he offered a fifth version of the facts with regard to his activities and whereabouts on Wednesday, September 24, 2003. In the process, he contradicted almost everything that he had previously told the police and, instead, claimed that he intentionally misled the PCSO investigators because Marshall Mark Mullins had threatened to kill him, his parents, and his former girlfriend if he mentioned that Mullins or an unnamed group of "others" were involved in the murders of Jarvis and Sousa.

During his testimony at trial, Rigterink again admitted that he was at the crime scene, but claimed that he arrived after an apparent attack, explored unit 5, followed the blood trail to unit 1, and then ran down the hallway in unit 1 where he crashed through the doorway separating the rear-office and warehouse areas. Once inside the warehouse area, he discovered both victims. According to Rigterink, Jarvis was still alive and reached up and grabbed Rigterink's hand and arm and then slumped back to the floor. Rigterink then heard what he thought were car doors slamming shut, so he ran outside. As he exited unit 1, he saw a dirty white van drive away. When the van drove past, Rigterink made eye contact with the driver and a passenger. . . .

In an apparent attempt to explain his unorthodox response to discovering two very bloody murder victims (one of whom was an acquaintance or friend), Rigterink consistently described himself as "freaked out," and explained that he had never encountered this type of situation. He never called 911 and never told anyone about the gory, blood-filled scene that he had discovered because on the 24th he

was still "freaked out," and on the 25th, Mullins allegedly visited Rigterink at his condo and issued the death threats.

. . . .

Much of Rigterink's trial testimony was also inconsistent with the testimony of other witnesses. For example, his ex-wife testified that he always kept a large military knife with a curved tip and a ten- or eleven-inch black blade lodged between their mattress and box spring. Also, both the male and female eyewitnesses testified that one man—not a group of two or three men—pursued Jarvis. An additional concern with Rigterink's testimony involved the amount of time between when the PCSO received the 911 calls (close to 3:08 p.m.) and when the first responders arrived on scene (close to 3:18 p.m.), which would have made it difficult for Rigterink to have arrived after the murders occurred and to have then explored units 5 and 1 before "freaking out" and leaving all before law enforcement arrived. . . .

2 So. 3d at 228-240 (footnotes omitted) (some alterations in original). After the jury convicted Rigterink for the first-degree murders of Jarvis and Sousa, it recommended a sentence of death for each murder by votes of seven to five. Id. at 227. The trial court found two aggravating circumstances with respect to both murders, and assigned them great weight: (1) Rigterink had previously been convicted for a capital felony (based on the contemporaneous murders); and (2) the murders were especially heinous, atrocious, or cruel (HAC). Id. With respect to Sousa, the trial court also found the aggravating circumstance that she was murdered to avoid lawful arrest, and assigned this factor great weight. Id. The trial court found one statutory mitigating factor—that Rigterink did not have a significant history of prior criminal activity. Id. The trial court assigned this factor only some weight because Rigterink admitted that he used illegal drugs since his

- 11 -

late teens, stole from his employer, and drove with a suspended driver's license.

Id.  The trial court also found twelve nonstatutory mitigating circumstances:

> (1) use of drugs (little weight); (2) reputation with family and friends as a peaceful person (some weight); (3) kindness and attention to maternal and paternal grandmothers (some weight); (4) desire to help other prison inmates (some weight); (5) religious commitment while in prison (some weight); (6) assisted turtles across roadways (little weight); (7) supportive family (moderate weight); (8) capable of kindness (some weight); (9) one credit hour remaining to obtain bachelor of science degree in biology (little weight); (10) sympathy for the victims' families (little weight); (11) ability to be educated and to educate others (little weight); and (12) exhibited appropriate courtroom behavior (little weight).

Id. at 228 n.7.  On the initial direct appeal, this Court reversed the conviction because it determined that the Miranda warnings were insufficient under its prior precedent of State v. Powell, 998 So. 2d 531, 540 (Fla. 2008).  Rigterink I, 2 So. 3d at 253.  The United States Supreme Court subsequently granted certiorari review of Powell and Rigterink I, and held that the warning in Powell was sufficient.  Florida v. Powell, 559 U.S. 50, 63 (2010).  The Supreme Court thereafter vacated Rigterink I and remanded the case for reconsideration in light of Powell.  Rigterink II, 559 U.S. at 965.  On reconsideration, this Court held that the warning provided to Rigterink was sufficient and affirmed his convictions and sentences.  Rigterink v. State (Rigterink III), 66 So. 3d 866 (Fla. 2011).

On June 22, 2012, Rigterink filed a motion to vacate his convictions and sentences pursuant to Florida Rule of Criminal Procedure 3.851.  He filed an

- 12 -

amended motion on November 1, 2012. Rigterink requested an evidentiary hearing for the following claims, the denial of which are challenged in this appeal:[1] (1) Rigterink was denied a fair guilt phase because counsel were ineffective for: (a) failing to move to suppress the knife seized from Rigterink's condominium by his girlfriend; (b) failing to (i) investigate the circumstances surrounding Rigterink's statements, (ii) file a comprehensive motion to suppress all statements to law enforcement on October 16, 2003, on the basis that he was in custody when he provided the statements, or unable to waive his Miranda rights because of drug use and sleep deprivation, or (iii) present evidence to the jury that his statements were

---

1. Rigterink did not appeal the denial of the following claims for which he requested an evidentiary hearing: (1) he was deprived of a fair guilt phase because counsel were ineffective for failing to: (a) effectively challenge Rigterink's statements to police; (b) consult with or call an independent forensic witness trained in bloodstain pattern analysis; and (c) utilize the services of an expert sociologist or psychologist to assist the jury in understanding that an accused can falsely confess to a crime; (2) he was deprived of a fair penalty phase because counsel were ineffective for failing to: (a) utilize the services of a mitigation expert to any meaningful extent; and (b) consult with an independent forensic medical examiner regarding issues surrounding the deaths of the victims, and the extent to which each victim suffered or apprehended their fate; and (3) cumulative error. Rigterink also did not appeal the denial of the following claims, for which he did not request an evidentiary hearing: (1) counsel were ineffective for failing to renew objections that Florida's death penalty scheme violates Ring v. Arizona, 536 U.S. 584 (2002); and (2) the death sentences violate Rigterink's right of protection from cruel and unusual punishment because he may be incompetent at the time of execution. In addition, we do not presently address the United States Supreme Court's recent decision in Hurst v. Florida, 136 S. Ct. 616 (2016), because Rigterink has not raised a Ring or Hurst claim in his postconviction motion or in this appeal.

- 13 -

not voluntary; (c) failing to object to the cross-examination of Rigterink regarding his uncharged theft from his former employer; (d) failing to conduct adequate attorney-client interviews with Rigterink and prepare him to testify; (e) failing to (i) adequately investigate alternate suspects and (ii) establish a foundation for William Farmer's testimony to satisfy the requirements of sections 90.405 and 90.804, Florida Statutes (2005); (f) failing to (i) thoroughly investigate Rigterink's mental state at the time of the murders, and (ii) follow up on recommendations by mental health professionals; and (g) failing to object to the introduction of shoes purchased by the State that matched the tread found at the murder scene; and (2) Rigterink was denied a fair penalty phase because counsel were ineffective for: (a) failing to (i) have Rigterink examined by a mental health expert, (ii) utilize Rigterink's drug history to establish the mitigating factors that at the time of the murders, Rigterink's ability to conform his conduct to the requirements of the law was impaired (substantially or otherwise), and/or he was under a mental or emotional disturbance (extreme or otherwise), and (iii) present witnesses who could testify about Rigterink's drug abuse and bizarre conduct at or near the time of the murders; (b) attempting to develop the statutory mitigator of no significant criminal history, but allowing Rigterink to testify regarding uncharged criminal conduct; (c) conceding the aggravating circumstances of prior violent felony and HAC; and (d) failing to object to argument by the State that the jury should

- 14 -

consider the non-statutory aggravating factors of self-centeredness, lack of appreciation for others, manipulation of others, drug use causing financial hardship for his family and causing his marriage to fail, theft from his employer, and that Rigterink is shockingly evil.

The circuit court held a Huff[2] hearing and granted an evidentiary hearing on each of these claims.[3] During the hearing, Rigterink presented the testimony of David Carmichael and Byron Hileman, Rigterink's trial counsel; Rosalie Bolin, the investigator and mitigation specialist hired during trial and for the postconviction proceedings; Julie Dantzler, a licensed mental health counselor who met with Rigterink prior to the murders; Dr. Jeffrey Hunter, a doctor who conducted drug tests on Rigterink prior to the murders; Dr. Tracy Hartig, a psychologist who was consulted prior to trial; Dr. Thomas McClane, a psychiatrist who was consulted before trial; Dr. Daniel Buffington, a clinical pharmacologist hired for the postconviction proceedings; and Dr. Harry Krop, a psychologist hired for the postconviction proceedings. Additionally, Rigterink presented the testimony of Catherine Enriquez, his ex-wife; Richard Rigterink, his uncle; Mary Dezialo, his sister; and Courtney Sheil Betz, his girlfriend at the time of the murders. These

_____

2. Huff v. State, 495 So. 2d 145 (Fla. 1986).

3. The circuit court also granted an evidentiary hearing for the claim that counsel were ineffective because they failed to effectively challenge Rigterink's statements to police.

- 15 -

individuals testified with respect to their knowledge of Rigterink's drug abuse prior to and around the time of the murders.

Hileman and Carmichael testified with regard to their representation of Rigterink. They stated that although both the guilt and penalty phases were blended efforts, Hileman predominantly worked on the guilt phase and Carmichael predominantly worked on the penalty phase. Both Hileman and Carmichael testified that their options and approach to the defense changed once Rigterink renounced his confession and asserted he was coerced into claiming involvement in the murders.

Bolin testified with respect to a number of topics also testified to by Hileman and Carmichael. However, Bolin's testimony was contrary to that of the attorneys on a number of issues, predominantly with respect to their diligence and investigation into Rigterink's drug abuse. For example, counsel and Bolin presented conflicting testimony with respect to whether counsel received a memorandum written by Bolin that she claimed to have faxed to Hileman's office on October 22, 2003, and which concerned her interview of Rigterink on October 20, 2003. The memo indicated that Rigterink informed Bolin that before 2 p.m. on the day of the murders, he consumed ice,[4] Xanax, and Darvocet within an hour of

_____

4. Dr. Buffington testified that ice is methamphetamine. Hileman testified that ice refers to crystal methamphetamine.

each other. The memo also contained a list of associates he received drugs from, and a history of his drug use, including that over the previous fifteen years, he had used acid one hundred times, ecstasy one hundred times, cocaine thirty times, methamphetamine forty to fifty times, and marijuana all the time. The memo also indicated that Rigterink used prescription drugs, including Xanax, Percocet, Vicodin, and Darvocet, as well as ice. Bolin testified that she conducted this interview at Hileman's direction, but Hileman testified that he did not believe he had been hired to represent Rigterink at the time the interview was conducted, and he could not recall ever directing an investigator to interview an individual before he had been officially retained and the attorney-client privilege had attached. In response to the conflicting testimony, the State presented evidence to impeach Bolin, including her personal relationship with a capital defendant and a billing disagreement between her and Carmichael.

Dantzler testified that Rigterink was referred to her prior to the murders. She diagnosed Rigterink with cannabis dependence and suspected polysubstance abuse. Similarly, Dr. Hunter testified that he performed two drug tests on Rigterink prior to the murders. The first test was taken on August 25, 2003, approximately one month before the murders, and indicated the presence of amphetamines, tetrahydrocannabinol (THC), and opiates. The second test was taken on September 15, 2003, and indicated the presence of only THC.

Dr. Hartig testified that she was retained by the public defender's office after Rigterink's arrest.[5] Based on her initial consultation, she concluded that Rigterink was sane, but she wished to perform further tests and recommended consultation with other experts in light of Rigterink's report of an increase in substance abuse prior to his arrest, blackout experiences, seizures, a history of head injuries, and memory issues. Similarly, Dr. McClane was hired by Hileman before trial to evaluate Rigterink, and Rigterink provided him with a history of extensive drug use. Dr. McClane testified that he believed Rigterink was a chronic drug abuser, and that he would have investigated substance abuse had he been retained further.

Dr. Buffington was consulted for the postconviction proceedings and testified during the hearing with respect to the effects of acute and chronic substance abuse. He testified that a blood test taken the day of the confession indicated the presence of hydroxyalprazolam (indicating he consumed Xanax), cannabinoids, and norpropoxyphene (the active ingredient in Darvocet). He testified that he could not determine whether Rigterink would have been affected by these drugs at the time of the statement, but would not rule it out as a possibility. He concluded that either acute drug use at the time of the murders or chronic substance abuse substantially impaired his ability to conform his conduct

---

5. Rigterink was represented by a public defender for several days before his parents retained Hileman. Carmichael was later appointed as cocounsel.

- 18 -

to the requirements of the law, and caused him to be under an extreme mental or emotional disturbance.

Dr. Krop was also retained for the postconviction proceedings. He testified that based on his understanding of Rigterink's drug use, he would opine that as a result of acute and chronic drug use, Rigterink's capacity to conform his conduct to the requirements of the law was compromised on the day of the murders, and Rigterink was under a serious emotional disturbance. He preferred to use the term "compromised" rather than "severe" because he felt the jury would determine whether it was severe, and compromised was a more clinical term.

In response, the State presented the testimony of Hileman; Carmichael; Dr. Enrique Suarez, a psychologist; Detective Joseph Britt Williams; Lieutenant Jerry Connolly; Sergeant Kenneth Raczynski; and Sergeant Ivan Navarro. Detective Williams and Sergeant Navarro met with Rigterink at his condominium on September 25, 2009, the day after the murders, and they testified that Rigterink did not appear to be under the influence of any drugs.[6] Lieutenant Connolly and Sergeant Raczynski met with Rigterink on October 9, 2003, and testified that Rigterink did not appear to be under the influence of any drugs at this time.

---

6. Detective Williams testified Detectives Thomas Van Skyver and Brett Thompson accompanied him when he met with Rigterink. Sergeant Navarro stated that Detective Tracy Smith accompanied him when he met with Rigterink.

Additionally, they were both present during Rigterink's October 16, 2003, interrogation and testified that Rigterink did not appear to be under the influence of any drugs at that time.

Dr. Suarez testified that his review of Rigterink's videotaped confession demonstrated Rigterink was not impaired by drugs or alcohol. He also concluded that Rigterink's actions on the day of the murders demonstrated that he was not suffering from an extreme mental or emotional disturbance. He also testified that, based on his review of the materials in this case, "[t]here's no sign at all that [Rigterink] was experiencing a delirious state, none."

On April 11, 2014, the circuit court denied relief on all claims.

## ANALYSIS

With respect to claims of ineffective assistance of counsel, this Court has explained:

> [T]he test when assessing the actions of trial counsel is not how, in hindsight, present counsel would have proceeded. See Cherry v. State, 659 So. 2d 1069, 1073 (Fla. 1995). On the contrary, a claim for ineffective assistance of trial counsel must satisfy two criteria. First, counsel's performance must be shown to be deficient. Strickland v. Washington, 466 U.S. 668, 687 (1984). Deficient performance in this context means that counsel's performance fell below the standard guaranteed by the Sixth Amendment. Id. When examining counsel's performance, an objective standard of reasonableness applies, id. at 688, and great deference is given to counsel's performance. Id. at 689. The defendant bears the burden to "overcome the presumption that, under the circumstances, the challenged action 'might be considered sound trial strategy.' " Id. (quoting Michel v. Louisiana, 350 U.S. 91, 101 (1955)). This Court has made clear that "[s]trategic

decisions do not constitute ineffective assistance of counsel." See Occhicone v. State, 768 So. 2d 1037, 1048 (Fla. 2000). There is a strong presumption that trial counsel's performance was not ineffective. See Strickland, 466 U.S. at 669.

Second, the deficient performance must have prejudiced the defendant, ultimately depriving the defendant of a fair trial with a reliable result. [Id. at] 689. A defendant must do more than speculate that an error affected the outcome. Id. at 693. Prejudice is met only if there is a reasonable probability that "but for counsel's unprofessional errors, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome. Id. at 694. Both deficient performance and prejudice must be shown. Id.

Zommer v. State, 160 So. 3d 368, 376-77 (Fla. 2015) (quoting Bradley v. State, 33 So. 3d 664, 671-72 (Fla. 2010)). In reviewing claims that allege ineffective assistance, this Court employs a mixed standard of review. See State v. Woodel, 145 So. 3d 782, 791 (Fla. 2014). The Court reviews the factual findings of the circuit court for competent, substantial evidence, but reviews legal conclusions de novo. Id. Where one prong of the Strickland standard is not met, this Court need not address the second prong. Henry v. State, 862 So. 2d 679, 683 (Fla. 2003).

**Investigation into Rigterink's Mental State**

Rigterink contends that counsel provided ineffective assistance during the guilt phase because they failed to thoroughly investigate his mental state at the time of the murders, and failed to follow up on either of the examinations that were undertaken, or the recommendations of mental health professionals. However, Rigterink does not allege that his mental condition would support an insanity

defense. Indeed, Dr. Krop testified, "I would not diagnose him of having any psychiatric disorder, just the substance abuse disorder."

We conclude Rigterink fails to establish deficiency. Florida does not recognize the defense of diminished capacity in this context. See Spencer v. State, 842 So. 2d 52, 63 (Fla. 2003); Chestnut v. State, 538 So. 2d 820, 824-25 (Fla. 1989). The failure to raise a meritless claim does not result in deficient performance. See Spencer, 842 So. 2d at 63; see also Buzia v. State, 82 So. 3d 784, 796 (Fla. 2011) (holding that counsel was not ineffective for failing to present evidence of drug and alcohol addiction during guilt phase to demonstrate that the murder was not planned because voluntary intoxication is not a valid defense). Accordingly, we deny relief on this claim.

**Motion to Suppress on the Basis of Voluntariness**

Rigterink alleges that counsel provided ineffective assistance during the guilt phase when they failed to file a pretrial motion to suppress his October 16, 2003, statements to law enforcement on the basis that they were involuntary as a result of Rigterink's drug use. Alternatively, Rigterink asserts that even if the statements could not be suppressed, evidence of drug use should have been presented during trial so that the jury could have evaluated the voluntariness of the statements, or considered drug use as a basis for his inconsistent statements. A blood test taken

- 22 -

after Rigterink provided his October 16 statements revealed the presence of Xanax, Darvocet, and marijuana in his blood.

In support of this claim, Rigterink presented the pretrial report of Dr. Hartig, which advised:

> It might be important to explore Mr. Rigterink's ability to waive <u>Miranda</u>, considering his substance abuse at the time of his arrest. I recommend Mr. Rigterink be evaluated by a neurologist and a neuropsychologist to address Mr. Rigterink's blackout experiences, seizures, history of head injury and memory issues. Also, evaluation by an expert in illicit substances and pharmaceuticals to address substance effects on Mr. Rigterink's functioning [is] recommended.
> . . . .
> Background information provided by Mr. Rigterink was remarkable for escalating substance abuse problems . . . .

Similarly, Dantzler and Dr. McClane testified with respect to their understanding of Rigterink's drug abuse. For example, Dantzler testified that when she met with Rigterink in May and June 2003, he reported past rampant and indiscriminate drug use. Although Dantzler suspected polysubstance abuse, Rigterink informed her he used only marijuana at that time, and she rendered a provisional diagnosis of cannabis dependence.

Rigterink also presented Dr. Buffington, who testified during the evidentiary hearing that he believed Rigterink's substance abuse <u>could</u> have affected his ability to provide a voluntary statement to law enforcement. With respect to the results of the blood draw taken after Rigterink confessed, Dr. Buffington testified that he could not "opine emphatically" that Rigterink would have been actively affected

- 23 -

by the drugs present in his system, but it was possible. He also testified that the blood test demonstrated marijuana could have been ingested within hours of the blood draw, but that there is no method to determine degree of impairment based on the test.

This vague testimony does not provide significant support for Rigterink's claim that his statements were involuntary. Notably, Dr. Buffington never reviewed the videotape recording of Rigterink's confession. Moreover, his opinion did not take into consideration the observations of the individuals with whom Rigterink interacted that day, despite Dr. Buffington's own testimony that when determining the degree of a person's impairment, it is relevant and helpful to consider descriptions of the person's behavior by those who interacted with him or her. Rigterink's family members and Detective Connolly, the officer who took Rigterink's confession, described Rigterink's behavior as normal. When informed of this, Dr. Buffington discounted the helpfulness of these observations, explaining that to Rigterink's family, bizarre behavior by Rigterink would be viewed as normal. Dr. Buffington also stated that Detective Connolly's observations did not alter his opinion because, as a detective, he would not necessarily be capable of determining Rigterink's cognitive status.

In contrast, Dr. Suarez, the mental health expert presented by the State, testified that his review of the videotaped statement revealed no indication that

Rigterink was impaired by drug use. He explained that Rigterink was attentive and verbally fluent, provided responsive answers without hesitation, was engaged, and displayed no mispronunciation or slurring. The circuit court found Dr. Suarez's testimony to be more persuasive than that of Dr. Buffington.

Counsel testified that they were aware of the positive drug test results from the blood sample taken after Rigterink confessed. Carmichael consulted with Dr. Mark Montgomery, a toxicologist who performed retrograde extrapolation of the test results. Dr. Montgomery concluded that the test results indicated the drugs present fell below a clinical level. Carmichael also deposed the State toxicology expert and learned that the results of the State's test were consistent with the results of the test taken by the public defender's office. Carmichael testified that he considered the issue of involuntariness, but believed there was no good faith basis for such an argument.

The circuit court's finding that Rigterink failed to establish that his statements deserved any diminished weight, or that his drug use demonstrated that his statement was not given freely, knowingly, and voluntarily, is supported by competent, substantial evidence. We have previously held that an inebriated condition does not affect the admissibility of a confession unless it rises to the level of mania. See Thomas v. State, 456 So. 2d 454, 458 (Fla. 1984) (citing Lindsey v. State, 63 So. 832, 833 (Fla. 1913)). Instead, this evidence may be

presented to the jury so that it may consider the weight and credibility to be given to the confession.  Id.

This Court has affirmed the ruling of a trial court with respect to the admissibility of a confession alleged to be inadmissible because of intoxication where the ruling was supported by competent, substantial evidence.  In Orme v. State, 677 So. 2d 258, 262 (Fla. 1996), the trial court ruled that a statement was admissible despite testimony by friends and family of the defendant that he was severely intoxicated during the relevant time period.  In contrast to that testimony, the officers who were present when the defendant provided his statement testified that he was coherent and responsive.  Additionally, the trial court reviewed the statement, which was taped, and determined that it supported the position of the State.  We held this constituted competent, substantial evidence to support the ruling of the trial court.  Id. at 263; see also Walker v. State, 957 So. 2d 560, 576 (Fla. 2007) (affirming denial of a motion to suppress on the basis of intoxication despite conflicting evidence because the testimony of the officers that the defendant was coherent and forthcoming constituted competent, substantial evidence that supported the ruling of the trial court).

Here, the evidence provided by Rigterink—the results of the blood test and the reports of various doctors—contrasts with the information provided to Rigterink's trial counsel, the observations of Detective Connolly, Rigterink's

appearance and demeanor in the videotaped confession, and the opinion of Dr. Suarez. The State introduced competent, substantial evidence that Rigterink's statements were not involuntary or entitled to diminished weight. Moreover, counsel investigated this potential claim, and reasonably decided that it was without merit. Therefore, Rigterink has failed to establish deficiency and we deny relief on this claim. See Merck v. State, 124 So. 3d 785, 800 (Fla. 2013) (holding counsel cannot be deficient for failing to present a meritless defense).

**Failure to Present Mitigation Related to Drug Abuse**

Rigterink also claims counsel provided ineffective assistance during the penalty phase because they failed to present evidence of his drug abuse to demonstrate how his ability to conform his behavior to the requirements of the law was impaired, substantially or otherwise, or that he was under a mental or emotional disturbance at the time of the murders, extreme or otherwise. In support of this claim, Rigterink presented the previously discussed testimony of Dr. Hartig. Additionally, Rigterink presented the intake form he completed for Dr. McClane. On the form, he indicated that he had "extensive drug use in past," including the use of marijuana, cocaine, methamphetamine-ice, methylenedioxy-methamphetamine (MDMA), gamma-hydroxybutyric acid (GHB), alprazolam (Xanax), OxyContin, Darvocet, Percocet, lysergic acid diethylamide (LSD), and mushrooms. Additionally, Dr. McClane testified based on his notes that Rigterink

reported he consumed methamphetamine a couple of days prior to the offenses and at approximately 2 p.m. on the day of the offenses, took four milligrams of Xanax two nights before the offenses and two milligrams of Xanax the night before the offenses, and smoked marijuana throughout that time period. Dr. McClane testified that he would diagnose Rigterink as a chronic drug abuser; however, Rigterink did not inform Dr. McClane that he was addicted to methamphetamine.

Rigterink also presented the testimony of Dr. Krop, who determined that Rigterink suffered from substance dependence. Dr. Krop concluded that Rigterink's use of amphetamines would have resulted in significant cognitive and emotional behavioral manifestations. With regard to mitigation, Dr. Krop testified that there was a reasonable degree of psychological probability that Rigterink's capacity to conform his conduct to the requirements of the law was compromised on the day of the murders. He also testified that Rigterink's chronic and acute drug use would result in a serious emotional disturbance on the day of the murders. Dr. Krop also opined that Rigterink was in an irrational frenzy during the murders.

Further, Dr. Buffington testified that Rigterink suffered from both acute and chronic substance abuse at the time of the murders. With respect to acute drug use, Rigterink informed Dr. Buffington that he used cocaine, marijuana, and methamphetamine at or around the time of the murders, which Dr. Buffington opined would have rendered Rigterink impaired. Dr. Buffington testified that

either the chronic or acute substance abuse by Rigterink at the time of the murders created a significant concern that his ability to conform his conduct to the requirements of the law was impaired. He also testified that either the chronic or acute substance abuse by Rigterink at the time of the murders resulted in him suffering from an extreme mental or emotional disturbance.

In contrast, Dr. Suarez testified that he found no evidence that Rigterink suffered from an extreme mental or emotional disturbance at the time of the crimes. He explained that a delirium state can lead to a blackout, but that Rigterink's behavior was inconsistent with a delirium state. For example, Rigterink engaged in goal-directed behavior—such as checking the victims' pulses, retrieving his backpack from Jarvis's unit, and disposing of evidence—but Dr. Suarez testified that a person in a delirium would not know what he or she was doing, and would be disoriented and detached. Additionally, Dr. Suarez testified that a delirium state would not be short-lived and would have been noticed by those who interacted with Rigterink only shortly after the murders. Dr. Suarez also explained that the extreme degree of inconsistency between the stories provided by Rigterink suggested he was malingering and feigning, and no validity could be ascribed to what Rigterink said.

With respect to Rigterink's behavior after the murders, Betz, who was Rigterink's girlfriend at the time, testified that she met Rigterink around 6:30-7

p.m., approximately three-and-a-half to four hours after the murders. She stated that Rigterink behaved normally and rationally, did not appear concerned, and did not have any memory problems. She had previously observed Rigterink while he was under the influence of methamphetamine and cocaine, and testified that he did not appear to be under the influence of any drugs that evening.

Although investigator Bolin testified that counsel failed to pursue several penalty phase issues, this was contradictory to the testimony of counsel. Counsel testified that they were aware that Rigterink utilized drugs, and they consulted members of Rigterink's family with respect to his drug use. They reviewed the drug tests conducted by Dr. Hunter, and were informed as to the recommendations made by Dr. Hartig and Dr. McClane. Hileman testified that he specifically questioned Rigterink with respect to abuse of the drug ice, which was denied by Rigterink. Additionally, Carmichael testified that he discussed Rigterink's drug use with Bolin, but she never indicated Rigterink's use of drugs other than marijuana was more than experimental.

Additionally, counsel testified that they considered the mitigating factors of extreme mental or emotional disturbance and Rigterink's ability to conform his conduct to the requirements of the law, but that when Rigterink declared his earlier statements regarding the snapshot memories were false, this avenue of investigation was no longer viable. Carmichael described their strategy as follows:

> [W]e did not believe that there was a sufficient basis to say that there
> was substantial drug use, or some sort of hard or nefarious drug [use]
> that went beyond what the jury already heard.  They had already heard
> about the use of marijuana. . . .  I did not get the feel[ing] that the jury
> in this particular case, after having convicted him . . . was going to give
> him some kind of benefit for using drugs, when it appeared that drugs
> were both the cause and the motive for the homicide of Jeremy Jarvis,
> and then what actions occurred with Allison Sousa afterwards.
>
> And, in fact, I felt that they were going to be counterproductive,
> that instead we should focus on who [Rigterink] was before he
> engaged in drugs and what kind of support system that he had . . . .  I
> want[ed] them to see who he could be, what he could do in the future,
> what he was doing right now, to show that he was a different person
> now than he was at the time that that happened, who his support group
> was going to be, who he was before he got involved in drugs, and to
> humanize him.

Hileman also testified that he believed drug use, and particularly use of

methamphetamine, was not a mitigating factor favored by juries unless it rose to

the level of causing brain damage.

Counsel is not ineffective for failing to present mitigation based on a

strategic decision made after a reasonable investigation.  See Dufour v. State, 905

So. 2d 42, 56 (Fla. 2005).  Evidence of drug abuse may present a double-edged

sword, and the election to avoid the potential negative impact of such evidence is

not unreasonable.  See Reed v. State, 875 So. 2d 415, 437 (Fla. 2004) (holding

counsel was not ineffective for failing to present evidence that the defendant "once

broke his grandmother's nose, abused drugs over many years, was jailed on

various occasions, continued his drug use after his brother took him in on the

condition that he stop using drugs, and threatened to kill his brother's wife").

- 31 -

Additionally, this Court has held that the decision to humanize a defendant by focusing on positive character traits was not deficient where counsel determined other mitigation was not strong and was potentially more harmful than helpful. See Jennings v. State, 123 So. 3d 1101, 1114 (Fla. 2013) (holding the decision by trial counsel not to present mental mitigation evidence was not unreasonable where the mental mitigation would have opened the door to the defendant's extensive drug use and criminal history, and where the decision was "based on [trial counsel's] experience, the reports of competent experts, and [trial counsel's] strategy of emphasizing [the defendant's] many positive character traits over his negative traits"). Here, counsel investigated and were aware of Rigterink's drug history and reasonably determined that a better strategy was to develop positive mitigation. Occhicone, 768 So. 2d at 1048 ("[S]trategic decisions do not constitute ineffective assistance of counsel if alternative courses have been considered and rejected and counsel's decision was reasonable under the norms of professional conduct.").

Moreover, during trial, Rigterink disavowed the snapshot version of events that he provided to Drs. Hartig and McClane and testified that he was not involved in the murders. Thus, presentation of these doctors would have contradicted the trial testimony of Rigterink. Counsel is not ineffective for making a tactical decision not to present evidence contradictory to that presented during trial. Cf.

Hannon v. State, 941 So. 2d 1109, 1126 (Fla. 2006) (holding counsel was not ineffective for failing to investigate and present mental health mitigation that was inconsistent with an innocence defense because defendant insisted on maintaining his innocence and wished to focus on his character); Cummings-El v. State, 863 So. 2d 246, 252 (Fla. 2003) (holding counsel was not ineffective for failing to present evidence of drug use, poor upbringing, and family history of criminal convictions that would have been inconsistent with the strategy of presenting the defendant in a positive light, and the defendant made it extremely difficult for counsel to obtain mitigating evidence). Accordingly, Rigterink is not entitled to relief on this claim.

## Failure to Present Mitigation Related to Mental Health

Rigterink next claims that counsel provided ineffective assistance during the penalty phase because they failed to have him examined in any meaningful way by an expert in the field of psychiatry, psychology, or mental health. However, Rigterink fails to establish any possible prejudice that is separate and distinct from that alleged in the previous claim. No mental health expert during the postconviction proceedings diagnosed him with any major mental illness unrelated to substance abuse. This is consistent with the findings of Drs. Hartig and McClane that counsel received prior to trial.

Moreover, Dr. Hartig conducted a personality test on Rigterink prior to trial, and found "significant psychopathology with depression, anxiety, substance abuse and bizarre thought processing." Other personality tests administered by Dr. Hartig revealed "an antisocial individual who was impulsive, aggressive and at time engaged in irrational behaviors." Counsel did not wish to present this type of testimony to the jury. Additionally, counsel testified that they considered presenting evidence related to mental health, but their strategy changed once Rigterink informed them that he claimed to have experienced blackouts because he read that in a psychology textbook. Instead, counsel elected a reasonable strategy in which they chose to humanize Rigterink. Accordingly, Rigterink is not entitled to relief on this claim. Occhicone, 768 So. 2d at 1048.

**Failure to Present Mitigation Related to Bizarre Behavior**

Rigterink claims counsel provided ineffective assistance during the penalty phase because they failed to investigate potential mitigation, or interview and present potential witnesses who would have testified with respect to Rigterink's drug abuse and bizarre conduct at or near the time of the offenses. Again, this claim is not dissimilar to the claim that Rigterink's drug abuse should have been presented in mitigation, except that it identifies specific individuals who would have testified with respect to his drug use. Those individuals include his sister, Mary Dezialo; his ex-wife, Catherine Enriquez; Betz; and his uncle, Richard

- 34 -

Rigterink. Each of these individuals testified during the evidentiary hearing regarding his drug use. Rigterink also presented the testimony of Dr. Hunter, who conducted two drug tests within approximately one month of the murders. Dr. Hunter testified that the first test results were positive for amphetamines, THC, and opiates, and the second test showed THC. Rigterink also relies on the previously-discussed testimony of Bolin regarding counsels' alleged deficiencies in investigating mitigation.

Enriquez testified that Rigterink regularly used marijuana, but rarely used ecstasy, cocaine, and LSD. She also testified that Rigterink used prescription pills recreationally later in the marriage. Similarly, Betz testified that she observed Rigterink use cocaine, methamphetamine, and mushrooms two times each between April and his arrest in October 2003. She described Rigterink's use of drugs other than marijuana as "sporadic and occasional."

Richard and Dezialo testified with respect to the duration of Rigterink's drug use. Richard stated that the family was concerned about Rigterink's drug use for almost twenty years prior to the murders, and Dezialo testified that Rigterink began experimenting with drugs in the early 1990s. Richard confronted Rigterink in person about his drug use after a drug test revealed the presence of amphetamines. Additionally, although Dezialo never witnessed Rigterink use any drug other than marijuana, she cleaned his condominium after his arrest and found tinfoil and

yogurt lids with burn marks, which, to her knowledge, are associated with use of crack cocaine. She also found a marijuana grow room in the attic.

Dantzler testified she was never contacted by trial counsel. She had met with Rigterink prior to the murders and determined he suffered from cannabis dependence. During a meeting with Rigterink, Dantzler informed him that he had failed to succeed with outpatient rehabilitation and outlined a plan that he would be required to follow, or she would refer him for inpatient counseling.

The above testimony is not dissimilar to what counsel already knew with respect to Rigterink's drug use. As previously stated, counsel pursued a reasonable trial strategy that focused on Rigterink's positive attributes, and presented evidence only of his marijuana use. Accordingly, we deny relief on this claim. See Windom v. State, 886 So. 2d 915, 922 (Fla. 2004) ("A strategic or tactical decision is not a valid basis for an ineffective claim unless a defendant is able to show that no competent trial counsel would have utilized the tactics employed by trial counsel.").

## Suppression of Pre-Miranda Statements

Prior to his post-Miranda confession, Rigterink provided three different versions of events to the police. First, he explained that he spoke with Jarvis on the day of the murders, but did not see him. Rigterink I, 2 So. 3d at 234. After he was confronted with disbelief, he explained that he did meet with Jarvis, but Jarvis

was alive and well when he left.  Id.  Rigterink was then confronted with further disbelief and the bloody fingerprint evidence, which led him to explain that he arrived after the murders, saw blood, touched everything in Jarvis's apartment while looking for him, followed the blood trail to the other unit, checked the victims' pulses and determined they were dead, then panicked and fled when he realized he was covered in blood.  Id.

Counsel testified during the evidentiary hearing that they did not believe they had a good faith basis to move to suppress the pre-Miranda statements made by Rigterink, and decided to concentrate their efforts on the validity of the Miranda warning.  Rigterink alleges counsel were ineffective for failing to challenge the pre-Miranda statements because he was in custody when the officers informed him that they knew he was lying and that his bloody latent fingerprints were discovered at the scene of the murders.

The interview on October 16, 2003, unquestionably began as a voluntary interaction.  See Roman v. State, 475 So. 2d 1228, 1230-32 (Fla. 1985) (holding that defendant who voluntarily travelled to the police station was not in custody). The Miranda warnings are necessary only when a suspect is subject to custodial interrogation, or, in other words, when a suspect is questioned by law enforcement after being taken into custody or otherwise deprived of his or her freedom of action in a significant way.  See Ross v. State, 45 So. 3d 403, 414 (Fla. 2010).  Custody

- 37 -

occurs if a reasonable person would feel he or she were not at liberty to terminate the interrogation and leave.  Id.

Rigterink does not identify the precise point at which he alleges custodial interrogation began.  To the extent that Rigterink alleges counsel were ineffective for failing to move to suppress the second version of events, this claim is without merit because Rigterink cannot establish prejudice.  Strickland, 466 U.S. at 697 ("[T]here is no reason for a court deciding an ineffective assistance claim to . . . address both components of the inquiry if the defendant makes an insufficient showing on one.").  With respect to the third version of events, which was provided after Rigterink was confronted by bloody fingerprint evidence, we conclude counsel were deficient for failing to move to suppress this pre-Miranda statement.

Hileman testified during the evidentiary hearing that during the pre-Miranda period, Rigterink

> was confronted with the fingerprint evidence, and that, obviously, did upset him, but he did not claim that he was threatened or . . . screamed at or coerced in any other way.  He was confronted repeatedly with, we think you're lying, we think you're involved. . . .  So to that extent, he was under some pressure.  But that is normal in a police interrogation.

However, a suspect need not be threatened or coerced to be in custody.  Rigterink I, 2 So. 3d at 251 ("The presence of force would certainly indicate custody, but its absence does not necessarily—or even often—indicate that a reasonable person

would feel free to simply get up and leave the interview room.").  In Rigterink I, we explained:

> Other than a murder weapon or DNA evidence tying the killer to the victims, it is difficult to imagine a more incriminating evidentiary item than one's bloody fingerprints being discovered at the scene of the murders.  Along with, and in consideration of, all other factors, a reasonable person in Rigterink's position clearly would not have felt free to leave police custody once the detectives disclosed this fingerprint match. . . .  [T]his fingerprint match was very strong physical, albeit circumstantial, evidence of Rigterink's guilt. . . .

2 So. 3d at 252 (emphasis added).  Thus, we conclude counsel were deficient for failing to recognize that custody occurs when a reasonable person would not feel free to leave.

Nonetheless, Rigterink is not entitled to relief on this claim because he has failed to establish prejudice.  Although this third statement would not be admissible as substantive evidence if suppressed, it would be admissible for impeachment.  Harris v. New York, 401 U.S. 222, 225 (1971).  Additionally, the fourth and most inculpatory statement—in which Rigterink admitted to being at both warehouse units, holding a knife consistent with the wounds suffered by both victims, being covered in blood, and struggling with Jarvis—followed a valid Miranda waiver and was admissible as substantive evidence.  See Oregon v. Elstad, 470 U.S. 298, 317-18 (1985) (holding that where an initial statement is obtained in violation of Miranda, but a later statement is obtained following the

- 39 -

<u>Miranda</u> warnings, the post-<u>Miranda</u> statement is admissible if it was voluntarily made).  Thus, counsels' failure to move to suppress this statement does not undermine our confidence in Rigterink's conviction, and Rigterink is not entitled to relief on this claim.

**Suppression of Knife**

During trial, the State presented a knife that Betz obtained from Rigterink's condominium.  The knife was not the murder weapon and did not resemble the murder weapon.  Rigterink alleges counsel were ineffective for failing to move to suppress the knife presented during trial on the basis that it was obtained in violation of the Fourth Amendment to the United States Constitution because Betz acted as an agent for the State when she removed the knife from Rigterink's condominium.

The circuit court held that no Fourth Amendment violation occurred because Betz qualified as a co-occupant of Rigterink's condominium under <u>United States v. Matlock</u>, 415 U.S. 164 (1974).  In <u>Matlock</u>, the United States Supreme Court held that consent to a search could be granted by a third person with common authority over, or a sufficient relationship to, the premises searched.  <u>Id.</u> at 171.  The Supreme Court explained that "common authority" means

> mutual use of the property by persons generally having joint access or
> control for most purposes, so that it is reasonable to recognize that any
> of the co-inhabitants has the right to permit the inspection in his own

right and that the others have assumed the risk that one of their number might permit the common area to be searched.

Id. at 171 n.7. Additionally, in Illinois v. Rodriguez, 497 U.S. 177, 186 (1990), the Supreme Court held that the exclusionary rule did not apply where consent was provided by a person who possessed apparent authority—i.e., a person whom the State reasonably believed had the ability to provide consent.

Here, Rigterink gave Betz a key, she was allowed to go to the condominium whenever she wanted, and no restrictions were placed on which parts of the unit she could enter. Betz did not live at the condominium, but spent the night there three to five times a week. The knife was located in the bathroom of a second bedroom in the condominium. Betz testified that she found the knife when she went to Rigterink's condominium to let the dog out. After Betz saw the knife, she called the detective and informed him of it. The detective met her at the condominium and asked if she would bring the knife out, which she did.

Rigterink relies on State v. Moninger, 957 So. 2d 2 (Fla. 2d DCA 2007), to assert that whether Betz was a co-occupant was the incorrect inquiry. He asserts the correct inquiry is whether Betz acted as a state agent. In Moninger, the defendant was accused of sexual battery on his fifteen-year-old daughter. Id. at 3. Detectives responded to the residence and informed the daughter she was being removed from the home. Id. The detectives asked the daughter if any evidence existed to substantiate her claim, and when she responded that she believed there

- 41 -

were condoms in the house, the detectives stated that if she wished to, she could retrieve them as she left.  Id.  They provided her with a bag in which to place the condoms.  Id.  The Second District Court of Appeal suppressed the condoms on the basis that the daughter acted as a government agent when she retrieved them.  Id. at 4.

However, Moninger is inapplicable to the current case.  First, Moninger involved a minor, and this Court has delineated specific factors that apply to determine whether a minor has common authority.  Saavedra v. State, 622 So. 2d 952, 957 (Fla. 1993).  Additionally, the Second District in Moninger did not address the issue of common authority.  Although the State alleged that the daughter had joint control over the home, the district court held: (1) that the claim was insufficiently briefed, and (2) there was no evidence that the daughter and the defendant shared the room where the condoms were located, or that the daughter had joint control over the house.  Moninger, 957 So. 2d at 4.  The district court did not address either Matlock or Saavedra.  Thus, Rigterink's assertion that the circuit court erred in considering co-occupancy of Rigterink's condominium on the basis of Moninger is misplaced.

We conclude the ruling of the circuit court is supported by competent, substantial evidence.  Additionally, even if Betz did not possess common authority, she possessed apparent authority.  Thus, we conclude no Fourth Amendment

- 42 -

violation occurred. Moreover, even if Betz had lacked the authority to remove the knife, the inevitable discovery doctrine would apply, see generally Nix v. Williams, 467 U.S. 431 (1984), because the police would have located the knife when they executed the search warrant for Rigterink's condominium. Thus, we conclude counsel were not deficient for failing to move to suppress the knife on the basis of a Fourth Amendment violation. Merck, 124 So. 3d at 794.

Rigterink also alleges counsel were deficient for failing to object to the introduction of the knife on the basis that it was irrelevant and constituted improper character evidence that demonstrated only that Rigterink was the type of person to own dangerous and deadly weapons. Counsel testified that they believed the introduction of the knife supported the theory that the State was reaching to supply evidence to connect Rigterink to the crime.

Regardless of whether the strategy employed by counsel was reasonable, Rigterink cannot establish prejudice from the introduction of the knife. During trial, Enriquez testified that throughout their marriage, Rigterink kept a knife with a black, eleven-inch blade and curved tip under the mattress. Jarvis and Sousa were stabbed with a knife that had a ten- to eleven-inch blade. Rigterink I, 2 So. 3d at 230. Additionally, Enriquez testified that when she was in the condominium after the police searched it, she saw that the mattress was "pretty much taken off the box spring" and the knife was not there. The knife used during the murders

- 43 -

was never recovered by law enforcement.  Id. at 239 n.16.  Finally, in his final statement to police, Rigterink admitted to owning such a knife and throwing it over a bridge after the murders.  Id. at 234.  Accordingly, there is no reasonable possibility that the introduction of the knife Betz obtained from Rigterink's condo—which was not the murder weapon—affected the verdict in this case and we deny relief on this claim.

**Suppression of Shoes**

During trial, the State introduced a pair of Nike shoes it purchased that had a tread pattern consistent with that left in blood at the murder scene.  During the investigation, law enforcement found an empty shoe box in Rigterink's condominium, but they did not find the corresponding shoes.  The State purchased the model of shoe identified by the empty shoe box.  During trial, a tread expert testified that the shoes' tread was consistent with one left at the scene.  The expert also testified that he could not identify the tread at the scene as being left by a specific shoe, but could only exclude shoes that did not match.  The expert was able to exclude a different pair of Nike shoes that were seized from Rigterink.

Although the shoes constituted circumstantial evidence, they were relevant. § 90.401, Fla. Stat. (2003) ("Relevant evidence is evidence tending to prove or disprove a material fact.").  Evidence is not irrelevant or inadmissible simply because it is circumstantial in nature.  Cannon v. State, 107 So. 360, 363 (Fla.

- 44 -

1926).  Here, the shoes presented matched those described on the empty box found in Rigterink's condominium, and a person could reasonably infer that Rigterink owned such shoes.  Rigterink's ownership and possession of shoes with a tread consistent to that found in blood at the murder scene tends to prove that Rigterink committed the murders.  Thus, the shoes constituted relevant, circumstantial evidence and counsel were not deficient for failing to object to their introduction. See Merck, 124 So. 3d at 794 (holding counsel cannot be deemed ineffective for failing to raise a meritless issue).

Moreover, counsel testified during the evidentiary hearing that they did not object to the introduction of the shoes because they believed the use of the shoes demonstrated that the State was reaching to present evidence that linked Rigterink to the murders.  This strategy was not unreasonable with respect to the shoes. Accordingly, Rigterink is not entitled to relief on this claim.  Windom, 886 So. 2d at 922 ("A strategic or tactical decision is not a valid basis for an ineffective claim unless a defendant is able to show that no competent trial counsel would have utilized the tactics employed by trial counsel.").

### Failure to Object to Prior Criminal Conduct

Rigterink alleges counsel provided ineffective assistance during the guilt phase because they failed to object to evidence that he previously stole from an employer.  He also alleges this evidence, as well as evidence that he drove with a

- 45 -

suspended license, prejudiced him during the penalty phase because the trial court relied on this information to assign less weight to the mitigating circumstance that Rigterink had no significant history of prior criminal activity.

Approximately one month prior to the murders, Rigterink was terminated from his employment because he improperly used a company credit card to purchase food, drink, and gas. The State cross-examined Rigterink with respect to these events, based on a theory of the case that Rigterink was experiencing financial hardship, went to Jarvis's to purchase marijuana despite his lack of funds, and killed Jarvis to obtain marijuana. Later, during closing statements, the prosecutor stated, "God knows what's in his heart. And what's in his heart is nothing but evil. . . . A man who would steal from his employer, taking a paycheck in one hand and stealing from him with the other."

Defense counsel were aware prior to trial that the State intended to use this evidence because the State filed a motion of their intent to use this evidence. Defense counsel did not object when the State cross-examined Rigterink regarding the theft. Carmichael testified that he felt the evidence was appropriate and relevant to the theory of the State's case. We agree that Rigterink's financial status was relevant to his motive. See Ballard v. State, 66 So. 3d 912, 917-18 (Fla. 2011) (explaining that "relevant evidence of other crimes, wrongs, or acts is admissible if the probative value to show motive, intent, preparation, plan, knowledge, identity,

or absence of mistake or accident outweighs any unfair prejudice, confusion of the issues, misleading of the jury, or needless presentation of cumulative evidence"). The fact that Rigterink had recently stolen to purchase necessities, then lost his job, demonstrates that he may not have been able to pay for the drugs. Accordingly, counsel were not deficient for failing to object.

Moreover, Rigterink cannot establish prejudice during either the guilt or penalty phases. Rigterink's testimony that he was not involved in the murders was severely impeached by his confession, which was inarguably more significant than an uncharged and minor theft. Additionally, with respect to the remark by the State during guilt phase closing statements that the theft demonstrated Rigterink was evil, the uncharged theft was not the sole basis for this comment. The State also relied on evidence that Rigterink received financial assistance from his father, but still spent money on drugs, and also that Rigterink had a girlfriend while married to another woman. Rigterink does not allege that counsel were deficient for failing to object to these remarks.

With respect to the penalty phase, Rigterink does not claim counsel were ineffective for failing to exclude evidence that he used illegal drugs, which was one basis for the reduced weight assigned to the mitigating factor of no significant prior criminal history. Additionally, the evidence that Rigterink drove with a suspended driver's license was relevant to Rigterink's decision to drive his father's

vehicle on the day of the murders—he explained that he believed he was less likely to be stopped by law enforcement if he did not drive his own car. Further, driving with a suspended license is a relatively minor infraction. See § 322.34, Fla. Stat. (2003) (classifying driving with a suspended license as a moving violation, and classifying knowingly driving with a suspended license as a second-degree misdemeanor if it is the first offense of this type). In contrast, the State established the weighty mitigators of HAC and prior violent felony with respect to both victims. Thus, there is no reasonable possibility that this evidence affected Rigterink's sentences.

### Adequate Communication

Rigterink alleges that counsel failed to adequately communicate with him and prepare him for trial, which adversely affected the penalty phase because Rigterink's testimony with respect to prior illegal activities undercut the statutory mitigating factors that he had no significant prior criminal history, that his ability to conform his conduct to the requirements of the law was impaired, and that he was under an extreme mental or emotional disturbance at the time of the murders. To support this claim, Rigterink presented Bolin, who testified that she was never included or present during any discussion of whether Rigterink should testify, that Hileman refused to visit Rigterink in jail, and that Rigterink's father threatened to withhold payment unless Hileman worked on the case.

In contrast, during the evidentiary hearing, Hileman testified that he extensively discussed with Rigterink whether Rigterink should testify during trial, recommended to Rigterink that he not testify, and specifically informed Rigterink that he would be impeached by his prior statements. Hileman also warned Rigterink that his proposed testimony that several people committed the murders then threatened Rigterink into confessing would be inconsistent with the testimony of the eyewitnesses, who described only one attacker who matched the physical description of Rigterink. Additionally, Hileman advised Rigterink that the testimony not only was not an effective defense, but would also negatively impact the penalty phase. Despite this advice, Hileman testified that Rigterink was confident he could persuade the jury of his innocence and told Bolin, "give me 20 minutes with the jury and I can convince them."

With respect to trial preparation, Hileman testified that prior to trial, he discussed the facts of the case with Rigterink and provided him with examples of questions he intended to ask. Although Hileman did not practice a list of specific cross-examination questions with Rigterink, he discussed with Rigterink questions he believed would be difficult and warned him with regard to potential pitfalls. Similarly, Carmichael testified that he discussed the decision of whether to testify with Rigterink, as well as what to anticipate if he testified, including during cross-examination.

- 49 -

The circuit court found that counsel were not deficient, and the testimony of Hileman and Carmichael is competent, substantial evidence that supports this finding. Accordingly, we deny relief on this claim.

**Penalty Phase Closing Statements**

During the penalty phase closing statements, the prosecutor described Rigterink as evil in connection with his explanation of what the HAC aggravating circumstance encompasses. Specifically, the prosecutor stated:

> [T]here is a second type of evil, and it is an evil that emanates from within an individual. It is an evil that is part of that individual. It is an evil that is within that person.
> . . . .
> But it comes from within the individual. It's produced by the individual. And its consequences come from the choices that that individual makes without being affected by others.
> And I would suggest to you that that is the far, far, far more disturbing type of evil. That is the type of evil that we're talking about here. When they tell you heinous means extremely wicked or shockingly evil, that's what we're talking about. . . .
> The analysis that must be engaged in . . . is to review what happened, what took place here . . . and even the more fundamental question, why did it happen. . . .
> And you have to look prior to September the 24th to understand . . . why it happened. This wasn't just an explosion of things that happened on that day. There were a series of events which gave you an insight, an insight into what's inside Thomas Rigterink . . . .
> There was an insight into the self-centeredness, the lack of appreciation for his conduct on others. There was a—there was manipulation—in fact, lies was part of that manipulation—to his family, to his wife, his parents, . . . the police, his employer, and he attempted to do it to you.
> Mr. Rigterink's behavior goes back in terms of the drug use is— is just an example of doing what he wants without concern[] about the consequences to others. . . .

Sort of begs the—or doesn't really address the issue of what his wife was doing that time working two jobs. . . . You know, she is the one that's making the effort here, and there doesn't seem to be any responsible attitude on his part. . . .

Now, there was more than one letter that was written to you that suggested . . . the drugs caused hi[s]—marriage to fail. That's nonsense. Infidelity . . . made his marriage fail. And it's this . . . same self-centeredness that caused it, what I want, how I choose to resolve the problems that I perceive.

That's the self-centeredness that's at the heart of this case. . . .

The drugs were of no influence to Mr. Rigterink's behavior. Every witness that told you that said they didn't perceive anything. . . .

It was an appetite for drugs and the loss of his wife's financial support that caused the theft from [his employer]. It was that simple. That's all it was. And when that source of revenue ended, he had to find another.

He already had an insight on how he chooses to resolve those financial problems. It's that same self-centered behavior that he doesn't care if somebody else is even giving him a paycheck for his work, he's going to take what he wants.

Rigterink alleges counsel were deficient for failing to object to the description of him as evil and shockingly evil. He also alleges that the remarks were improper because aspects of his character do not affect the HAC aggravating circumstance.

With respect to what may be said during closing statements, we have previously explained:

In Florida, wide latitude is permitted in presenting opening and closing statements to a jury, and comments by the prosecutor will merit a mistrial only when they deprive the defendant of a fair and impartial trial, materially contribute to the conviction, are so harmful or fundamentally tainted as to require a new trial, or are so inflammatory they might have influenced the jury to reach a more severe verdict than it would have otherwise rendered.

- 51 -

Miller v. State, 161 So. 3d 354, 382 (Fla. 2015). Additionally, the use of the term evil alone during closing statements does not entitle a defendant to a new trial. See Lugo v. State, 845 So. 2d 74, 107 (Fla. 2003) (holding it was not fundamental error for the prosecutor to comment that the behavior of the defendant was "evil" and "hell on wheels"). But see King v. State, 623 So. 2d 486, 488-89 (Fla. 1993) (granting new penalty phase based on the prosecutor's "dissertation on evil" during penalty phase closing statements and remarks that a life sentence recommendation would constitute cooperation with evil).

To the extent that the remarks here were used to support the HAC aggravating factor, they were improper; this Court has repeatedly stated that HAC is evaluated from the perspective of the victim. See, e.g., Davis v. State, 121 So. 3d 462, 499 (Fla. 2013). Nonetheless, Rigterink has failed to establish prejudice. The HAC aggravating circumstance was proven by the State with respect to both victims, and the prior violent felony circumstance was established by the convictions for the contemporaneous murders of Jarvis and Sousa. These are two of the weightiest aggravating circumstances. See Matthews v. State, 124 So. 3d 811, 818 (Fla. 2013) (citing Hodges v. State, 55 So. 3d 515, 542 (Fla. 2010)). Therefore, there is no reasonable possibility that the remarks by the State contributed to the jury recommendations or sentences.

Rigterink also challenges the following remark by the prosecutor, which referenced the evidence presented by Rigterink that he could be a good influence when free of drugs:

> I would suggest to you that when he sat in this chair right here, right there, that chair last week and looked at you dead in the eye and said, "God knows what's in my heart, I did not kill these people," I heard him say it and each one of you heard him say it, no drugs were influencing him. . . .
> That was not the product of any illegal drugs that he had taken. That was the product of what evil that is within him. It is a product of the same motivation that caused the death of Allison Sousa and Jeremy Jarvis.

Rigterink alleges this was an improper remark that constituted argument of a nonstatutory aggravating circumstance and that characterized him in derogatory terms. He asserts that as a result of this and the previous remark, the advisory sentences of the jury were the result of an emotional response.

As previously stated, counsel undertook a reasonable strategy during the penalty phase of presenting Rigterink as a good person. The State is permitted to rebut proposed mitigation, and such rebuttal does not constitute argument of a nonstatutory aggravating circumstance. Cf. Tanzi v. State, 964 So. 2d 106, 115 (Fla. 2007) (holding that the State's questioning regarding lack of remorse was not improper because the defendant opened the door); cf. also Smith v. State, 28 So. 3d 838, 869-70 (Fla. 2009) (holding that presentation of family members to testify that Smith had a positive relationship with them would have opened the door to

evidence that the defendant previously had sexual conduct with his thirteen-year-old sister and was required to leave his home).  Here, Rigterink opened the door to rebuttal of his good character, and counsel were not deficient for failing to object to these statements.

For the reasons stated above, Rigterink is not entitled to relief on this claim.

**Concession of HAC and Prior Violent Felony Aggravating Circumstances**

During penalty phase closing statements, Carmichael conceded that the State established two aggravating circumstances:

> You see, there were aggravating factors proven by the State's office.  They indicated to you that there were two that applied for Jeremy Jarvis, that there were what I refer to as contemporaneous homicides.  There were two homicides.  They happened simultaneously, or very close to simultaneously, but two people are dead.
> Heinous, atrocious, and cruel.  We believe that you can conclude that the State has met their burden regarding that, although I have a few remarks in that regard.

Rigterink claims that these concessions resulted in ineffective assistance of counsel and denied him the right to adversarial testing.  With respect to the prior violent felony aggravating circumstance, we have previously held that counsel is not ineffective for conceding this circumstance where the jury convicted the defendant of the violent felony during the guilt phase.  See Schwab v. State, 814 So. 2d 402, 413 (Fla. 2002).

With respect to the HAC aggravating circumstance, during the evidentiary hearing, Carmichael testified that he did not believe there was any basis to contest this aggravating factor, and conceded it to build credibility with the jury. This Court has previously held that counsel pursued a reasonable strategy when he described the murder as brutal, but asserted that the defendant did not intend to torture the victim, who died quickly. See Dillbeck v. State, 964 So. 2d 95, 100-101 (Fla. 2007). This Court stated in Dillbeck that it was reasonable for counsel to confront the difficult issue instead of ignoring it, and that counsel reasonably sought to soften the impact of the evidence that would be presented by the State. Id. at 101.

Additionally, this Court has previously stated that counsel was not ineffective for conceding facts that were supported by overwhelming evidence because there was no reasonable possibility the jury would have rendered a different verdict. Patton v. State, 784 So. 2d 380, 390 (Fla. 2000). Similarly, in Wade v. State, 156 So. 3d 1004, 1031-32 (Fla. 2014), the Court held that counsel was not ineffective when he commented during closing statements that the actions of the defendant "were evil itself" and had "no moral justification." The Court reasoned that although the statements could be understood as a concession of the HAC aggravating factor, the defendant did not establish prejudice because he provided no explanation as to how counsel could have disputed HAC. Id. at 1032.

Here, it is undisputable that the murders qualified for the HAC aggravating circumstance. Jarvis was stabbed in his own residence, escaped, and then was chased down by Rigterink. Rigterink I, 2 So. 3d at 227. When Rigterink discovered him, Jarvis fought for his life before being stabbed to death. Id. at 228. He suffered from twenty-two knife wounds. Id. at 230. Sousa was working in the second unit where Jarvis fled. Id. at 228. She heard screaming outside the office before Jarvis, visibly wounded and bloody, entered the unit. Id. She attempted to call 911 before Rigterink entered, and when he was inside the unit she ran, yelling "Don't hurt me. Don't hurt me." Id. at 229. The 911 operator heard Sousa saying "Oh, my God. Don't—don't hurt me. No. . . ." Id. Sousa suffered from six knife wounds. Id. at 230. Both Jarvis and Sousa had injuries to their hands and limbs consistent with defensive wounds. Id. In the direct appeal, the scene was described as "bloody" and "vicious" with "[a] veritable trail of blood" down the hallway of the second unit, where the victims attempted to flee. Id. It is hard to imagine an argument that would credibly minimize the application of the HAC aggravating circumstance. Accordingly, Rigterink has failed to establish prejudice from the concession of the HAC aggravating circumstance and we deny relief on this claim.

**Investigation of Alternative Suspects**

Rigterink alleges counsel were ineffective because they failed to adequately investigate alternate suspects. However, Hileman's testimony during the evidentiary hearing directly contradicted this claim. Moreover, Rigterink has presented no evidence demonstrating that the further investigation of alternate suspects would have produced any fruitful information. Indeed, based on the testimony of Drs. Buffington and Krop, Rigterink does not continue to assert that the murders were committed by others, and has reverted to the snapshot memory version of events. The evidence presented during trial clearly establishes that Rigterink committed the murders, and counsel cannot be ineffective for failing to find evidence contrary to this after a reasonable investigation.

Rigterink also alleges counsel were ineffective because during trial they failed to ask the eyewitnesses to identify the individuals who Rigterink alleged committed the crime, did not ask the eyewitnesses to identify the composite sketch of the perpetrator, and did not establish the necessary foundation to present the testimony of William Farmer (one of the individuals who Rigterink alleged committed the murders, or who knew the individuals who committed the murders). In Rigterink III, we summarized the proffered testimony of Farmer as follows:

- Farmer is originally from Chicago, but has lived in the Lakeland and Winter Haven areas for the past several years. He has been in and out of jail "pretty much" his entire life.

- He provides security, debt-enforcement, and debt-collection services for drug dealers. He has been accused of, and investigated for, at least four homicides.
- He and Marshall Mark Mullins were merely "acquaintances by passing." He has never conducted business with Mullins in the drug trade. He simply knew some of the same people as Mullins.
- He offered his opinion that Mullins was more "off the chain" or aggressive with regard to his collection techniques.
- He denied any role in the Jarvis–Sousa murders, and denied any knowledge with regard to Mullins' alleged involvement with these crimes.
- He does not know Thomas Rigterink.

66 So. 3d at 893-94. Rigterink first sought to introduce this testimony to demonstrate Mullins made statements against penal interest, but it was excluded as conflicting hearsay that was not sufficiently corroborated. Id. at 894. Based on the same proffer, counsel later sought to introduce Farmer's testimony to show his knowledge of the interactions of individuals involved in the drug trade, witnesses involved in the case, and the reputation of Mullins. Id. This Court noted that the testimony was not framed or presented in terms of Mullins's reputation in the drug trade community and held that Farmer's testimony was based on mere personal opinion, fleeting encounters, or rumor, and was insufficient to satisfy the admissibility predicate of section 90.405(1), Florida Statutes. Id. at 895; see also § 90.405(1) ("When evidence of the character of a person or of a trait of that person's character is admissible, proof may be made by testimony about that person's reputation.").

Rigterink has provided no evidence that counsel would have been able to establish a sufficient predicate to introduce Farmer's testimony. Instead, he simply asserts that counsel were deficient for failing to adequately interview Farmer, conduct adequate legal research, or later recall Farmer to attempt to establish the requisite predicate. Rigterink also does not provide any evidence of what testimony Farmer could provide to tie either him or an alternate suspect to the murders. Accordingly, we hold this speculative claim is insufficient to establish a claim of ineffective assistance. See Valle v. State, 70 So. 3d 530, 550 (Fla. 2011).

## CONCLUSION

Based on the foregoing, we affirm the postconviction court's order denying postconviction relief on all claims.

It is so ordered.

LABARGA, C.J., and LEWIS, QUINCE, POLSTON, and PERRY, JJ., concur.
PARIENTE and CANADY, JJ., concur in result.

NOT FINAL UNTIL TIME EXPIRES TO FILE REHEARING MOTION, AND IF FILED, DETERMINED.

An Appeal from the Circuit Court in and for Polk County,
        J. Dale Durrance, Judge - Case No. 532003CF00698201XXXX

Ann Elizabeth Finnell of Finnell, McGuinness, Nezami, & Andux, P.A.,
Jacksonville, Florida,

        for Appellant

Pamela Jo Bondi, Attorney General, Tallahassee, Florida, and Scott Andrew Browne, Senior Assistant Attorney General, Tampa, Florida,

for Appellee